The United States Court of Appeals for the Federal Circuit is now open and in session. God save the United States and this Honorable Court. Thank you. Be seated. Good morning, everyone. The first case this morning is number 07-3292, Gingery v. Department of Defense. Oh, I'm sorry. We have an admission first before we get down to the more serious business. Judge Proust, will you move the admission of Ms. Hall? Thank you. Please come forward. Come to the podium. I move the admission of Jennifer L. Hall, who is a member of the Bar in good standing of the highest courts of Delaware and the Third Circuit Court of Appeals. I have knowledge of her credentials and I'm satisfied that she possesses the necessary qualifications. And I'd just like to say on a personal note that she's back today and we're happy to have her here. Jen's an alumni over whom we continue to take pride. She clerked in our chambers a year ago and after completing her clerkship here, joined Judge Jordan, many of us know, on the Third Circuit. And I had been hoping clerking might be her permanent calling and that perhaps she'd come back here to join us. But at least for now, she's decided to join a firm and staying in the Delaware area. And I'm very happy for her. It is with the deepest and greatest admiration and affection for Jen personally and professionally that I congratulate her and wish her all the best. So it's my great pleasure to grant Judge Prost's motion and to welcome you to the bar of this court. We look forward to seeing you in the future on that side of the podium. Now, if you will approach the clerk to administer the office. With your right hand, do you solemnly swear or affirm that you will comport yourself as an attorney and counselor of this court uprightly and according to law, and that you will support the Constitution of the United States of America? I do. Thank you. Thank you, Ms. Hall. And again, welcome. Thank you. OK. Now, again, case number 07-3292, Gingery against the Department of Defense. Mr. Gingery. Judge Newman, and may it please the court, in passing over Mr. Gingery for the position of auditor, the agency violated his veterans' preference rights in two distinct ways. First, it used an invalid accepted service hiring authority called the Federal Career Intern Program to deprive Mr. Gingery of his statutory veterans' preference rights. And second, even if we assume that that is a valid program, the agency was still required to use the competitive service Passover procedure of 3318B, which under 3320 also applies in the accepted service. If you're right about that, hypothetically, so the answer is that they deprived him of OPM approval of the Passover thing and of certain kinds of notice? It's a pretty exhaustive procedure before OPM. If hypothetically you were right on that, would we even reach the other issue? Yes, I believe so, Your Honor, because, well, for a few reasons. One is that if you agree on question two, the case gets remanded and we reconstruct the hiring process. And so the board would need guidance as to how exactly to reconstruct it, with the intern program in mind or under competitive service procedures with an OPM certificate. In addition- Well, I thought the portion of the process that you were really complaining about was the lack of compliance with that provision that requires that you go through OPM and that you get certain notice. What beyond that do you think your client was improperly deprived of? Well, also the right to take a competitive examination and the 10-point bonus would apply in the competitive service and that doesn't apply in the accepted service. Going back to that remand, if, for instance, when the hiring process is reconstructed, what job would Mr. Gingery get? Would he get a competitive service job with a one-year probationary period or would he get an accepted service job with a two-year probationary period? So it would affect a number of things. And beyond that, Your Honor, I think on a policy level, we have a decision from the board finding that program to be valid. And as Ms. Kaplan will talk about, this program is very problematic. It's used to hire over 15,000 people each year and deprive veterans of their preference rights on a large-scale basis. But on what basis outside of your client's claim under BEOA do we have the authority or the jurisdiction to look at some government program and saying there's been all kinds of abuses allegedly and so forth? And what's the authority for going into that territory? Well, I think it's just something to be mindful of when you look at the issue of discretion. I think you're raising, Judge Prost, on whether to reach the issue or to say that, well, we can resolve this on question two alone. I think you have discretion to reach question one, even beyond what I just talked about. Okay. But with respect to our discretion to reach question one, what is question one? It would seem to me, at least arguably, your client is before us. The only claim we have is a VEOA alleged violation. And therefore, we get to look at this position that he applied for and whether it was appropriately or not appropriately put in the accepted service under the FCCIP program. What beyond that, with respect to the FCIP program, do we have authority to look at? Well, I suppose that on a policy level, you might not consider how wide scale the program is to be directly relevant to the issue of veterans' preference, if that's what you're getting at. I mean, the only question before us, if any, appropriately, is that your client, there was some auditor position that he applied for, and the government decided that that position should be in this FCIP program and therefore in the accepted service. So the challenges with respect to, as I see it, the decision made with respect to this particular position, not what they may be doing with the FCIP program at the Department of Treasury and at the Department of Agriculture, right? Well, I don't think that's quite right because, of course, to do the way that my client was passed over was to use that program. And if we didn't have that program, then it would have been done under competitive service. Counsel, you say the program requires not, the president doesn't have unfettered discretion to accept jobs from the competitive service, correct? The statute, according to, as I understand your position, suggests that the president does have discretion to accept jobs from the competitive service, but only when there's a determination that's been made that it was necessary in the good administration, necessary for the good administration or warranted for the good administration. Is that right? That's right, Your Honor. So in this case, all the president did via his executive order was establish the FCIP program. He then delegated to OPM the choice of which jobs to allocate as a part of that program. So it's really no different than him saying there is some program for which people can be hired into the accepted service. And he did not, as apparent from that order, make any statements or obviously the agency is going to argue differently. But I understand you argue he didn't make statements suggesting that he made a finding that it was necessary to do this. But he also didn't articulate any particular jobs that ought to necessarily go. He didn't say all secretaries should be hired into this program or all customs officials or all anything. He just said, here's a program. Similarly, in the OPM reg, I didn't see OPM saying, aha, here's 118 job descriptions, like in the Horner case, which ought to qualify. So I guess the problem is I don't really see a valid challenge to either what the executive order or OPM's action, like I think Judge Post was trying to explain. I think the only challenge that you really have here is the decision to make his auditor job something that falls within the FCIP. You can't really challenge, it seems to me, the executive order itself or OPM's regs, because neither of them allocated any particular jobs into the accepted service. It got delegated down the chain. Well, first off, we're not challenging the executive order directly. There can be a valid program promulgated under that executive order. It just wasn't, though, for the reasons Your Honor just mentioned, the broad scope, giving agencies discretion to use this for any position. But why can't the agencies use it so long as some determination is made somewhere along the way that the particular jobs they decide to put into the program meet the necessary for good administration? Well, the regulation doesn't require the agencies to do that. The regulation doesn't say to Department of Defense— Does it matter whether it requires them to do it if they do it anyway? All that is required under the statute is that for jobs to be put in here, if there's anything at all required under the statute, your allegation is that it would require that before a job be put into an accepted service type position, a decision be made that it was necessary for the good administration. I mean, we really don't have broad authority to be reviewing the executive on these sorts of things. I mean, the Horner case that you rely on heavily indicates that. It's a very narrow, if any, potential for review here. And so even under your position, it seems to me that it's irrelevant whether the president does it himself, whether OPM does it themselves, or whether the agencies do it in the course of choosing, because they're all part of the executive. Well, perhaps, Your Honor, if the Department of Defense had independently conducted this sort of determination of necessity, then perhaps that could have saved the program in that very limited sense that at least DOD was using the program properly. But, of course, they did not, and that is undisputed. So all the court can do is say- But how is it undisputed? I kind of understood this to be a lot like Horner, that maybe if we were to agree with your position, this would be another instance where we would need to sort of vacate and remand for purposes of allowing the agency to introduce whatever evidence it may have to establish what they considered when they chose to make these auditor jobs part of the FCIP and, therefore, part of the acceptance process. I think this court's recent decision in GHS Health shows that they can't do that after the fact. They can't go back and say, well, were we really meant to rely on that? No, no, no. They can't create after the fact evidence that would justify their decision,  They never reported it in the Federal Register. The interim reg and the final reg in the Federal Register never had any indication- Counsel, you're missing me entirely. You can't challenge the OPM reg. You can't challenge the executive order. They haven't done anything wrong. They didn't allocate particular jobs. The only action you have here, if you have any, is a challenge to DCAA's decision to put these particular jobs into the FCIP program and, thereby, part of the acceptance service. So we wouldn't need OPM reg. You're challenging informal adjudication rather than informal rulemaking. That's the only challenge you have here. It just seems to me that we can say that at no step along the way did the executive, did OPM, did the agency, did anybody ever look at this issue of necessity. How do you know? Because of what's in- well, I think we do go to the executive order. We do go to the record that's reported in the Federal Register, and we don't see anything there. I agree with you. If either of those sources established it, then we wouldn't need to keep looking further down. But since neither of them do, why don't we remand this case for DCAA to have an opportunity to put in whatever evidence it may have to show what it did consider at the time that it chose to put these auditor positions into the FCIP program? Well, I think as a policy level, though, I would hope this court would require agencies, if they're going to have this kind of program that they report as part of the regulatory process, they give notice of this very notion of necessity, just like OPM did in Horner. They announced why it's necessary for this program to be used in this position or that or this GS level, something where everyone can see what they're doing and why. But they never did that here. But you preface this by saying, well, that's a matter of policy. Is there any requirement that they do so? Well, I believe 553 is it? Whatever the requirement is that agencies publish as part of the rulemaking. Counsel, doesn't the APA address this exactly? Because the APA indicates for informal rulemaking, there is notice that needs to go on. But for informal adjudication, there is not. So doesn't the APA actually contradict exactly what you're suggesting as a policy matter we ought to force agencies to do here? Well, of course, nobody looking at, you know, in the APA context, nobody looking at what was disclosed in the interim and the final regs would ever even know that this program was going to be used so broadly because there's never any indication that there's no necessity required or perhaps that individual agencies can conduct their own necessity analysis. Nobody looking at the record would ever know that to participate in the APA to challenge what's being done. I know we're arguing with you. We should leave it for the other side perhaps to do that. But let me ask you more of the question. I had understood that the real concern or at least the concern of your colleagues was not specifically whether the president is or is not authorized to issue such an executive order, but that in the nature of the implementation of the executive order, it has gotten to the stage where it contravenes the purposes of merit selection and competitive service and so on. And I was listening to hear whether in your exchange with my colleagues you were departing from that position. Well, no, not at all. But I'm saying I'm going through, I guess, hypothetical analysis of what if the agency had done an independent analysis of necessity, could it have been preserved in this one instance? And I imagine it could have, but it wasn't is my point. But is your position then that for every position which is placed, which could go either way, I think an auditor's position is not untraditionally in the competitive service, that there needs to be some kind of preliminary statement of necessity? Or how I'm concerned about putting additional obstacles in what we all understand is the executive prerogative if, in fact, from the numbers that you've given us, it does seem to have been exercised in enlarging ways. But that obstacle was something Congress demanded. It was noted there's a lot of discretion on the part of the executive, but they can't dispense with the whole concept of necessity altogether, and that's what's happened. Counsel, can I go back for one second to what Judge Prost asked you? So explain again for me, if you could, if we were to decide for you on the second prong, and we were to distinguish this case from Patterson, why would we still need to address the validity, your arguments with regard to the validity of the FCIP overall? Just explain that to me so I have it. So the competitive examination, this would have been done through a numerical competitive examination process with a 10-point bonus, which would have helped my client distinguish himself among the pool. And, again, this goes to OPM, so OPM can see his qualifications in a much more transparent way than if we just used the category rating system of the accepted service. Second, if we go down and remand, we have to reconstruct the hiring process. We need to know whether the interim program is valid or not, because otherwise we won't know which certificate to use to figure out who would have been hired if everything had been done properly. I think we're running well over time, and I'd like to give Ms. Kaplan, your plan was to participate at this stage initially, and we'll save you rebuttal time also. I didn't mean to interrupt, but I think we're going in circles. Good morning. My name is Elaine Kaplan, and I represent the National Treasury Employees Union, and I'd like to express our appreciation for allowing us to participate in this case, an oral argument. It's an important case, and so let me try to address the question I think we were just discussing here, which has to do with why the court should look at the OPM regulation when the court was suggesting, or at least Judge Moore and I think Judge Prost, that it was really a decision made by DOD to put Mr. Gingery's position into the accepted service. I don't think it's accurate to say that the Department of Defense decided to put Mr. Gingery's position into the accepted service. The Department of Defense doesn't have the authority to decide which positions go into the accepted service. Only OPM can decide which positions or what kind of hiring authority can be done pursuant to the accepted service. How does this work as a practical matter? Somebody decided that the auditor position should be put into this FCIP program. The DOD decided to use the accepted service hiring authority provided by OPM to hire for the auditor position. That's true. So it is their decision. But the finding of necessity really should be occurring in the context of the decision made by OPM to authorize accepted service hiring authority. So DOD has to go to OPM and get approval? No. When they decided to put this auditor position in the FCIP program, do they have the discretion outside of OPM's requirement to do that? They have the discretion because OPM has given them the discretion under the regulations. The FCIP regulations are very broadly written. What OPM is basically doing is it's creating a government-wide accepted service hiring authority. In this situation, the accepted service hiring authority that OPM provided was extremely broad, undefined, allows an agency to place any position under the FCIP program without limitation. That's what it says in the administrative record. The agency can put any position in the FCIP program. But it is not the agency that is deciding to put the position into the accepted service or to create the accepted service hiring authority. The agency doesn't have the statutory authority to do that. That's done by the Office of Personnel Management. Now, if the court were to find in this case that the FCIP program or that the OPM regulation was inconsistent with the statute, it's not an APA case. So the court is not striking down the FCIP regulation. What the court would be doing is saying that the FCIP hiring authority is invalid. You can't use the invalid hiring authority in the context of this case. And then it's going to be left, I guess, to the government to decide what to do. And it's invalid why? Because there needs to be a prerequisite finding of necessity before it can be used? Absolutely. Why can't that occur at the DCAA level? Suppose this regulation was crystal clear and OPM said the FCIP program exists and each individual agency needs to make a determination of necessity and once they have satisfied that can then hire a particular position into this accepted service FCIP program. Well, suppose that's what the reg said. So OPM was clearly and unmistakably delegating and telling the agency, and as part of this you make sure you do this necessity. Would it be invalid for them to do that, to delegate that job? Not necessarily. I used the word necessity again. But I think if OPM had put limitations within the program, within its own regulations establishing the FCIP hiring program that required or that delegated to the agency the authority to decide whether a particular position... So you're saying it's not invalid for the agency to do this. You just don't think OPM gave them sufficient direction on it? Well, I'm saying that the regulation is invalid. The hiring authority is invalid because OPM provided the agencies basically with carte blanche without limiting the regulation, limiting the hiring authority to circumstances where it was necessary. Let's assume in this case or in another we have a record replete with justification by the agency, by an agency that this position was necessary for us to use the FCIP program with respect to this secretarial position. Let's assume for the sake of argument that the agency had done that. Isn't that the end of the case? Under that circumstance do we go back and say, well, OPM didn't tell them to do that. They did it on their own and we strike down in the context of that particular case an OPM regulation? Well, as I said before, I don't think it's up to the agency to decide whether it's necessary unless OPM and your hypothetical may be delegated. Who has the authority under the statute or otherwise? Who has the final say on whether or not it's necessary assuming that criteria applies? Well, it's the President's job initially to determine whether there's a necessity for an accepted hiring authority, but the President has delegated that authority to OPM. So you're saying that every time an agency or in this instance the DCAA had to go up to OPM and say, we think it's necessary, now you have to make an independent determination of necessity before we can go forward? Is that the way you contemplate the system needs to be working? Well, I think the way this should have worked, frankly, is that OPM in its FCIP regulations should have set some – No, we're not talking about the way you would have liked it to work. The question is, what aspect of how it operates would you subsequently say was unlawful? So if it worked like that, if this agency had made a determination, you're saying their determination and showing uncontroverted need is not sufficient. I suppose if they – What if they did that and then they went up to OPM and said, can you stamp this if you agree with us? And OPM says, yes, we agree with you. This is absolutely necessary. And they say, yes. Is that what you're saying had to have been done? Well, I guess I can see that happening in the event that OPM had put in these regulations that kind of limitation that we're going to delegate to the agency the authority to determine when it's necessary to use the hiring authority. So they will come back to us and we will have to approve it. That's different.  You're saying that you agree that the president could delegate the function of necessity to OPM. Is there something that would preclude OPM for delegating that necessity determination to a particular agency? I don't think there's any statutory authority for OPM to delegate that kind of decision to an employing agency. Well, do they need authority or do they need a prohibition? I'm not sure what the answer is to that question. Let's hear from the other side. We're running well over time. Counsel, why doesn't 3320 resolve this? I mean, as a matter of clear statutory language, it says the qualified applicants in the same manner and under the same conditions required for competitive service by 3308 to 3318. So how is it that the government gets to skip over the Passover provisions articulated in 3318 and enact its own less stringent ones? May it please the Court. As Your Honor recognizes, this Court has already addressed that very specific issue in the Patterson case. In Patterson, the Court specifically looked to see whether Congress had spoken to the issue of how to apply veterans' preference rights in the accepted service. No, Counsel. In Patterson, the Court looked at whether 3309 applied to the accepted service. It didn't look at 3317 or 18, and it decided 3309 didn't apply because there are no examinations given for accepted service. In fact, examinations aren't even always given for the competitive service. So clearly there's a gap here because for the type of people that get hired without exam, the section simply doesn't apply to them. 3318 and 3317 contradicts that. And I was disappointed that the government briefing just flew right over this and didn't even address it. Well, with all due respect, although it is true that Patterson did not address 3318 and addressed a separate statute, 3309, in the course of addressing the issue of whether OPM's regulation could be different for accepted service than what was provided in Section 3309, the Court first looked to see whether Congress had spoken to the issue of how generally to apply veterans' preference rights. For purposes of 3309, they said there was a gap. They didn't say there was a gap with regard to 3308 through 3318. And if they had, it would have been dicta, which is why the Court didn't say something so broad as that. Actually, just a quote from the opinion, and this comes directly out of Patterson. Why don't you tell me right where you are, if you don't mind? I don't have the page site to this quote. I'll just look through the whole thing while you're talking. I'm sorry. We could provide it after the argument. But the quote is, Congress has not spoken on the issue of how to apply the principles of veterans' preference to positions in the accepted service that are not subject to exam. Close quote. Actually, you didn't quote the entire sentence, counsel. The sentence begins, it therefore necessarily follows that Congress has not spoken on the issue. So you missed the first half of that sentence. And when they say it therefore necessarily follows, immediately before that they talk about nothing but 3309 and the fact that 3309 is silent as to how it should apply to people who don't take examinations as part of their hiring process. Yes, Your Honor, and I'm aware that that did proceed it, but the Court still came to that conclusion. But obviously, Your Honor, you disagree with me that Patterson completely controls this case. The general principle in Patterson, though, was to look and see whether Congress had spoken to the issue of veterans' preference in a situation that doesn't apply here. Do you happen to have the statute with you, counsel? I do have the statute with me, absolutely. Can you look at your copy of 3317, which establishes certification from registers? Because as I understood, the only comment the government even made with regard to this is 3318 must not apply to the accepted service because 3317 says certification comes from registers, right? And what we said was that 3318 speaks directly to appointments in the competitive service. Competitive service differs from accepted service to a large extent because OPM is extremely involved in competitive service appointments. In accepted service appointments, we don't have OPM involvement. In Patterson, this Court said, when we're reviewing... Counsel, do you have your 3317 in front of you? I have 3318. I don't have 3317 in front of me. Okay, well, let me tell you, immediately following 3317, in the U.S. Code, not the U.S. Code annotated, but the U.S. Code itself are the historical and revision notes, which are sort of the greatest, most highest recognized form of legislative history because they actually accompany the statute when it's voted upon. And the revisionist notes actually say immediately afterwards, after 3317, application of this section to the accepted service and the executive branch and to the government of the District of Columbia, as provided in former section 858, is carried into 3320. It says unequivocally, this section is meant to apply to the accepted branch. Unfortunately, nobody cited that to us, but since we're looking at interpretation of a statute and it's a matter of law, I don't think there's anything that bars me from looking directly at the most relevant form of legislative history that tells me I'm supposed to apply this section to the accepted branch. Absolutely, to the extent possible, but the court said in Patterson that 3320 didn't mean, and the notes also don't mean that Congress intended for the exact identical procedures to be applied to competitive and accepted service. You just said to the extent possible. Now, in Patterson, we were dealing with testing procedures for a position that didn't require tests. That seems to kind of pass the possible and possible test. What is the possible argument with respect to the Passover provisions here and the notice requirement? Well, to the extent possible, the court also said in taking into account the fact that there are two purposes to be served when you're looking at application of veterans' preference principles to the accepted service. One principle obviously is providing a benefit to the veteran, but the other purpose that this court said in Patterson we need to look to be served is the flexibility inherent in accepted service appointments. And the flexibility that adheres to accepted service appointments derives in large part upon the control that's given to agencies over those appointments and the lack of involvement in OPM. The appointments pursuant to the competitive service, it's a very convoluted process. Mr. Dindery's attorney even conceded that when OPM gets involved in a Passover under competitive service appointments, it's very involved. It's very time-consuming. That's exactly what accepted service appointments seek to avoid by making it a more streamlined, more flexible process. And in Patterson, the court said we have to balance these two things when we look at OPM. But wouldn't another policy preference here go in favor of disabled veterans? It seems to me that since this particular Passover provision that they're concerned about only applies to veterans who are 30% or more disabled. Well, gosh, if I was going to look at any of these things and say these are the ones I think ought to be preserved, wouldn't that be the one, the most compelling one of all of these statutory provisions from a policy standpoint? Yes, Your Honor, and it does preserve that veteran's preference. It puts him in Section 3318A. It puts him in the highest category of preference. And 3318B, it makes the agency put any reasons for passing over him in writing. It makes the agency, it requires the agency to provide those reasons to him in writing if requested. Those are benefits that are not available to non-veterans. Would you disagree, Counsel, that the OPM reg that has been enacted with regard to these 30% or more disabled veterans is less beneficial to the veteran than would the following the statute have been? Because it certainly diminishes notice. It's not required to be given. The reasons aren't required to be given to him. You don't have to get OPM approval. I mean, don't you agree at least that the regulation gives less preference on a quantitative scale than does the statute? Well, first of all, just to correct you, the regulation does require the reasons to be provided to him upon request. Upon request. No, no, but the statute requires the reasons to be provided to him whether he asks for them or not. Right. Well, I would submit that that's a fairly minor difference. So the major difference here I am sure that you would say is in the competitive service, OPM has to get involved and has to approve the pass over request whereas in the accepted service, it's the agency that has to approve the pass over request. And again, I mean, I think it still protects the veteran because it does have to be approved. It does have to be in writing. Oh, I agree with you. I agree with you. It still protects the veteran but not quite as much as 3318. It's a less involved process. I mean, I don't think that we have to assume that OPM is going to be any more fair or conscientious than an agency. It's just more convoluted. If that were the case, then why in the world would Congress have seen the need in certain kinds of instances with 30% disabled veterans, Congress made the policy choice to say oversight by OPM is necessary for these most valued people who are in this disadvantaged situation. So whether you're going to stand here and tell me you can't imagine OPM would be any better for them than the agency, Congress obviously disagreed with you and decided oversight was necessary. Right. Well, again, that's true except that there is a balance here. So to the extent it's even slightly less, it's balanced out by the need for flexibility, dragging OPM into an accepted service appointment that up until then OPM has theoretically not necessarily had any involvement in. They haven't compiled the list of eligibles for the agency. They haven't reviewed the employee's qualifications to put them on the list. This is an agency-controlled appointment. And suddenly to drag OPM and then slow down the entire appointment process doesn't seem to me to be consistent with what this court said in Patterson, that we have to balance the veteran's preference with the flexibility that agencies need to make competitive service appointments. That's quite a dramatic statement, isn't it, that the agency can ignore all of these strictures which have been imposed because they're inconvenient? That would be a dramatic statement indeed, and I'm not making that statement. The agency can't ignore all the structures. The veteran is given a preference even under the accepted service procedures that OPM has promulgated. The veteran is first put in the highest category, and particularly 30% veteran would be in the very highest category in terms of being considered, and then could not be passed over unless the agency was able to articulate reasons in writing to approve that pass over, willing to give those reasons to the veteran.  It's a violation of his veteran's preference rights. He can go, as Mr. Egindri did in this case, he can get review of it by first the Department of Labor and then the MSPB. And I hear you also saying that the veteran can't complain or object to the fact that this position winded its way somehow into the accepted service, unlike traditional auditor's positions. Well, that, of course, is issue number one rather than issue number two, and I'm more than happy to, especially since I probably don't have much time. So the compelling issue, the compelling factor here is flexibility? It's a weighing, and I'm not saying that that overrides the veteran's preference at all. We still have veteran's preference rights being given. I guess I'm having a hard time getting by the statutory language, 3320, which says in the same manner and under the same conditions required for the competitive service by 3308 to 3318. What does that mean? Well, we know what it doesn't mean. We know that it doesn't mean that Congress intended the exact same procedures to be applied. And all we know is in one instance where it was impossible to apply the same exact thing because in one instance there was no test and in the other there was a test. Well, I think we can assume that they also didn't intend for the exact same rules to be applied in 3318. Otherwise, they wouldn't even need 3320. All they needed to do was have the words accepted service be in 3318. Those two statutes. Well, I don't understand. 3320 says in the same manner and under the same conditions under 3318. You might have liked it. What is the difference between doing that and having it in 3318? Why would they have bought it? If they meant 3318 to be applied identically exactly to accepted service and competitive service, why would they have needed to mention 3320? They could have simply put the words accepted and competitive service in 3318. So for that reason, you think we ought to construe words that Congress says in the same manner and under the same conditions to not really mean that because they should have done it this other way that would have made sense? Well, first of all, I think this Court actually already said that in Patterson, so I don't think I'm saying anything that Patterson didn't say. But in addition, yes, I think that the history of the Veterans Preference Act, both 3318 and 3320 were promulgated at the same time in 1944 when the Veterans Preference Act was passed. Can I move on to the next issue, though? I'm sorry, but I think we're going to run out of time. Do you agree at all? You have a footnote in your brief, footnote five, which seems to suggest kind of what Judge Moore and I, I think, were talking about here, that there is a means, at least one means, by which an individual can challenge this FSIP program and the placement of the position. And that is in an instance such as this, where the agency decides to put this auditor position in the FCIP program and the question is whether or not there was a requirement to show necessity and, if so, who had to do it. Does the government concede that much? Not exactly, Your Honor, no, because the necessity decision in this case was made by the President. I think one thing we all agree on, and I hope the Court, too, is that the President has the statutory authority to put positions in the accepted service. And in this case, the President exercised that authority. But he didn't designate which positions. He can't say hypothetically. Are you suggesting that he meant that the entire executive branch can be put under the FCIP program and he's authorized that as being necessary by the executive order? I don't think that's what he said in the executive order, and I think the closer that the Court hews to the language of the executive order, the clearer this case will be. The executive order specifically creates an intern program. The intern program is for entry-level positions. It speaks in Section 4 when it places those positions in the accepted service. It speaks to GS-5, 7, or 9 or other trainee-level positions. So the executive order basically covers everything that Mr. Gingery objects to about this program. It creates an intern program. It doesn't automatically say that every position for which an intern is hired under this program, then automatically, when it becomes permanent, is automatically excluded from the competitive service. It does say that every intern program is in the accepted service. It does say exactly that. When you're in the intern program, not when a permanent position is filled. It says... I'm not sure I understand your question. When the auditor's position became available as a permanent position, what you read to us doesn't say that the fact that you have a qualified intern in the intern program who can fill the permanent position, therefore, essentially automatically, because nothing else happened in between, that position becomes, by definition, a position in the accepted service, which is what happened here. I guess what happened here is that Mr. Gingery applied for an intern position in the accepted service. That's what he applied for. And that is what the executive order provides. He applied for an auditor's position. He applied for an auditor's position. That was in the intern program. The agency advertised it that way. They said, we have positions in our career intern program. And one of those positions is an auditor position, but it's in our intern program. But are you saying that the president, by signing this executive order, has made a determination that every entry-level GS 5 through 7 position, what you just read to us, by necessity should be in the FCIP program? No, because he left to the agencies the determination as to whether they need interns. And that's always an agency... I think it's not unusual for an agency to have the authority to determine what their workforce needs are. The Department of Justice determines how many attorneys it needs to hire, how many paralegals it needs to hire. An agency needs to make the determination as to whether to build its workforce to the talented and successful workforce that the executive order contemplates, whether and how many interns it needs to take on. What the president did was to make the determination of... So it's up to the individual agency to make a determination with respect to necessity. Not necessity about whether something should be in the accepted service, because that the president made that determination. What about the necessity of whether or not a particular job, which had existed previously in the competitive service, should now be placed in the FCIP program? Yes, whether they would like to have a particular job within the intern program, and then they have to adhere to all the elements of the program, including the training elements of the program. Is there a necessity determination on the part of the agency with regard to whether or not an auditor position should be put in this program? We can call it a necessity. I don't want it to be confused with the necessity that's in 3302 as far as the necessity of putting positions in the accepted service, because the president made that determination when he created the program. So we can call it necessity. I just don't want it to be confused with the necessity under the statute. Yes, the agency decides if they need interns to build up their workforce, and that's in the executive order, too. That didn't originate in the OPM regulations. In Section 1 of the executive order, the president says the career intern is a generic term, so agencies can use occupational titles as appropriate. In Section 2, they say agencies. The president says agencies are encouraged to identify and make use of these programs to meet department and agency needs. So directly from the executive order, establishing the program, putting the program positions in the accepted service. So the president made that determination, but left to the agencies, delegated to the agencies without any limits on it, to determine when they need to hire interns. And so that whole intern program was bought and sold on some notion that this is a particular special way to satisfy certain special needs that the executive branch has. Yes, the needs being to attract exceptional men and women. So when the president speaks about agencies making determinations about their own needs, isn't that part and parcel of that question? Well, I guess the only thing I'm saying is that the needs that the agency would have to rely on would be to be consistent with the executive order. I'm just trying to distinguish it. The agency is not making a determination about whether it's necessary to put intern positions in the accepted service. The president has already made that determination. The agency has to make a decision about whether they need an intern. As long as it's consistent with the executive order, which gives them basically complete discretion to decide whether they need it. Agencies should make use as they need it to meet department needs. So the president has said, I'm establishing the program, putting the program in the accepted service. Agencies, you can use the program as you need it. So there's really no limits on that. That's also a separate, very broad discretion. I just want to say one thing, and that's that maybe I'm missing the whole thing, but it seems to me that when you create the notion, when you create an intern program, it's that you're creating a new program and you're going to find a way to bring new people in in these positions. And the thing that's odd about this case, and perhaps about the way this whole program has been practiced, is when you take existing competitive service positions, you're not hiring new people from the outside to fill these new roles. You're taking existing positions, and you're just recasting them as intern positions. Well, I don't think that's exactly an accurate description of it. Well, that's what happened here, right? They took an existing auditor position, and they said we're going to take it out. Well, they said we need a new position, a new individual position. I mean, there are other auditors out there, yes. But we need a new position, and we want to bring an intern. Under this program, we'll be somebody that, number one, we can cast a wider net. We won't be as limited as we would be if we were hiring. I'm sorry to interrupt, but it's your view that any head of an agency can take every single competitive service position in that agency and just wholesale dump, nut dump, put them in to the FCIP program? No, because the FCIP program, the Career Intern Program, again, according to the executive order, is directed at entry-level positions. I'll modify that. They can take every existing GS-5 and GS-7 competitive level position and recast them as positions within the FCIP, irrespective of any demonstrable need. They could, and here's the reason why that that's not really a big concern. Number one, we know from the executive order that career interns have to be given training, education, and development, and it's very unlikely that any agency would want to spend so much time that their entire entry-level workforce is going to be devoting hours and hours to training. But, so it's just unlikely as a practical matter. But, number two, even if agencies started doing that, for example, there are two things that could possibly happen. Either the president would be upset because that's not how he envisioned the program as operating and could modify the program to preclude that from happening or direct OPM to do that. Or, Congress could be upset and any authority that Congress has delegated to the president, and this is within the president's authority to create the program, Congress can curtail that authority and in so doing affect this program. Counsel, can I ask you one quick question because your time is going to run out? Can I ask one question? One. Counsel for Mr. Gingery suggested that even if we decide the second question in his favor, we still have to reach the first. And I just wanted to hear, if you could, ten seconds on whether you agree with that or not. Do we have to reach the first if we were to find that an unlawful application of the Passover procedures were applied as to this veteran? Just to make sure I understand your question, if you're saying that you would find that the Passover, in this case, violate or the agency should have applied Section 3318, if that's what you're saying. I think that if the court decides it on those grounds, that the court does not have to address the first question, I believe. I was thinking about that, I know, when you posed it to my opponent, and I believe that that is the case. We will have to take that under advisement. Okay. Thank you, Ms. Stern. Thank you, Your Honors. Mr. Dewey, you have three minutes of rebuttal. If I could try to save question one, which is taking on water. I think the court should consider the board's decision in Dean, Deems, and Olson. When it came to looking at the Outstanding Scholars Program and the CAS program, the board struck down those programs. It didn't say that the fault lied with the agencies for failing to conduct their own necessity analysis under 3302. It said these programs are just unlawful. Part of it was because the board mistakenly believed that an executive order would make all the difference. The key to those decisions was that they were invalid under 3302. Counsel, this is a program. The president said, I'm creating a federal career internship program. I delegate to OPM. OPM said, regulation, federal career internship program, agencies can hire in this capacity. And suppose that the only hiring that ever got done in this capacity was secretaries, and every time an agency decided to hire a secretary to this program, it was because they tried and simply could not find people but for going through this program. I don't see how I could possibly strike down an executive order or an OPM reg which doesn't do anything wrong. You want us to because in application, you find this problematic. But it doesn't seem to me that you have an actual problem with the order or the reg. It's the application. I don't have a problem with the order. It's the reg. It's the implementation by OPM that's the problem. And again, the board, in those three cases I mentioned, didn't look to the agencies to do further fact-finding or findings on necessity. They just said these programs are invalid because they don't have any compliance with 3302. Now, imagine if this executive order creating the program said nothing of veterans' property. See, in Horner, actually, the OPM reg really designated 118 particular classifications of jobs into that PAC program and therefore in the accepted service. So in Horner, unlike this case, OPM made the decision about which job types would suddenly be considered part of the executive service. So there, it seems like they were rightly challenging the rulemaking of OPM. But here, OPM didn't. They left it for the agencies to decide whether they need to hire people into this internship program or not. But if Your Honor will indulge me, imagine if this executive order did not say anything about veterans' preference and the OPM regulation said nothing about veterans' preference and a veteran comes along and says, I didn't get my preference rights. I think the proper response would be, this program is invalid. It wouldn't be to say, well, we'll have to see if the agencies independently, perhaps behind the scenes, gave you veterans' preference. We would say that the program is invalid. Well, here we have a similar situation. We have noncompliance for the program in total, noncompliance with 3302. And I think following the board's prudent approach in Dean, Deems, and Olson, if we take that approach, we say the program as implemented by OPM, again, no problem with the executive order, as implemented, this program denied the petitioner his veterans' preference rights. And if I had to say one last thing, I believe counsel misspoke. The accepted service pass over provision 302.401B does not actually require agency approval. It just says record your reasons and make them available. And finally, unless the court has any other questions, I thank the court for requesting my pro bono appearance in the case. Is there any? Okay. Thank you. Thank you all. This is well presented. We will take it under advisement.